IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | NO. 18-cr-00218-01 |
| v. | : | |
| | : | |
| KASHAMBA JOHN | : | |

M E M O R A N D U M

Eduardo C. Robreno, J.                                  August 7, 2020

## Table of Contents

I.   **INTRODUCTION** .............................................. **1**

II.  **LEGAL STANDARD** ........................................... **3**

   A.   Motion for Judgment of Acquittal ........................ 3

   B.   Motion for New Trial .................................... 5

III. **DISCUSSION** ............................................... **5**

   A.   Weight and Sufficiency of the Evidence ................. 6

    1. Count I – Conspiracy ................................... 6

    2. Count II - Trafficking of J.S. ........................ 8

   B.   Co-Conspirator Testimony .............................. 15

    1. Federal Rule of Evidence 801(d)(2)(E) ................. 19

    2. Confrontation Clause .................................. 23

   C.   Separate Conspiracies Variance ........................ 25

   D.   Belated Disclosures ................................... 29

IV.  **CONCLUSION** .............................................. **33**

## I. INTRODUCTION

From 2011 to 2016, Defendant Kashamba John acted as chief pimp of a prostitution ring. In that capacity, he recruited females, and he supervised and organized their activities during which

sex for money was provided to male customers in hotel rooms in Pennsylvania, Florida, California, Georgia, North Carolina, and elsewhere across the country. The superseding indictment charged that some of the females recruited by John were underaged minors.[1]

Throughout this time, John had a number of people assisting with his operation, including Arianna "Amy" Somerville and Tyler Bachtel. ECF No. 157 at 41-45. Somerville is the mother of John's child, and she worked for John both as a sex worker and later by assisting John in the administration of the operation. Bachtel and John met after John responded to Bachtel's Craigslist post seeking an investor for a cannabis dispensary Bachtel was seeking to establish. ECF No. 156 at 91-92. Instead of investing all of the money Bachtel had requested for the dispensary, John recruited Bachtel to assist him in his commercial-sex operation.  ECF No. 156 at 96-98.

On January 24, 2019, a grand jury returned a four-count superseding indictment charging John with (1) conspiracy to engage in sex trafficking of minors or sex trafficking by force, threats of force, fraud, or coercion, in violation of 18 U.S.C. § 1594(c); (2) sex trafficking, attempt, and aiding and abetting by force, threats of force, fraud, or coercion, in violation of

---

[1]     As discussed below, the jury did not convict John of being engaged in a sex-trafficking conspiracy with an object of trafficking minors.

18 U.S.C. §§ 1591, 1594(a), 2; and (3) and (4) transporting an individual in interstate commerce with the intent that such individual engage in prostitution, and attempt thereof, in violation of 18 U.S.C. § 2421(a). On May 30, 2019, following an eight-day jury trial, the jury returned a verdict of guilty on all counts.[2]

Presently before the Court are John's Motion for Judgement of Acquittal, or in the Alternative, for a New Trial (the "Motion") (ECF No. 170) and his Supplemental Motion for Judgment of Acquittal and a New Trial (the "Supplemental Motion") (ECF No. 186),[3] regarding Count I, conspiracy, and Count II, sex trafficking of J.S. John does not challenge his conviction as to Counts III or IV, transporting of J.S. and L.E. for purposes of prostitution. For the reasons that follow, the Court will deny the motions.

## II.   **LEGAL STANDARD**

### A. Motion for Judgment of Acquittal

---

[2]   As to Count One, conspiracy to engage in sex trafficking, the jury returned an interrogatory finding John guilty of Count One upon a finding that an object of the conspiracy was to traffic by force, threats of force, fraud, or coercion. However, the jury did not unanimously find that an object of the conspiracy was to traffic minors.

[3]   Also pending is ECF No. 143, titled, "Kashamba John's Motion for Judgment of Acquittal or, in the Alternative, for a New Trial." That motion sought to preserve arguments that are raised in the Motion and the Supplemental Motion. Thus, the Court's consideration of the Motion and the Supplemental Motion will necessarily cover all arguments raised in the motion at ECF No. 143, and the Court need not separately reference that motion.

Rule 29 of the Federal Rules of Criminal Procedure provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). When faced with a Rule 29 motion, the Court must "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." United States v. Wolfe, 245 F.3d 257, 261 (3d Cir. 2001) (citing Jackson v. Virginia, 443 U.S. 307 (1979)). The Court "must be ever vigilant in the context of [Rule] 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005) (citing United States v. Jannotti, 673 F.2d 578, 581 (3d Cir. 1982) (en banc)). To that end, all reasonable inferences must be drawn in favor of the jury's verdict. United States v. Anderskow, 88 F.3d 245, 251 (3d Cir. 1996). Thus, the defendant seeking relief under Rule 29 bears "a very heavy burden." United States v. Anderson, 108 F.3d 478, 481 (3d Cir. 1997) (quoting United States v. Coyle, 63 F.3d 1239, 1243 (3d Cir. 1995)). "[A] finding of insufficiency should 'be confined to cases where the prosecution's failure is clear.'" United

States v. Smith, 294 F.3d 473, 477 (3d Cir. 2002) (quoting

United States v. Leon, 739 F.2d 885, 891 (3d Cir. 1984)).


   B. Motion for New Trial

   Pursuant to Federal Rule of Criminal Procedure 33, "[u]pon the

defendant's motion, the court may vacate any judgment and grant

a new trial if the interest of justice so requires." Fed. R.

Crim. P. 33(a). Motions for a new trial in the interest of

justice based on the weight of the evidence are committed to the

sound discretion of the district court. United States v.

Brennan, 326 F.3d 176, 189 (3d Cir. 2003). Under Rule 33, the

Court "does not view the evidence favorably to the Government,

but instead exercises its own judgment in assessing the

Government's case." United States v. Silveus, 542 F.3d 993, 1004

(3d Cir. 2008) (quoting United States v. Johnson, 302 F.3d 139,

150 (3d Cir. 2002)). However, "[a] district court can order a

new trial on the ground that the jury's verdict is contrary to

the weight of the evidence only if it 'believes that "there is a

serious danger that a miscarriage of justice has occurred—that

is, that an innocent person has been convicted."'" Johnson, 302

F.3d at 150 (quoting United States v. Santos, 20 F.3d 280, 285

(7th Cir. 1994)).


III. **DISCUSSION**

A. Weight and Sufficiency of the Evidence

    1. Count I – Conspiracy

Count I of the superseding indictment charged John with engaging in a sex-trafficking conspiracy in violation of 18 U.S.C. § 1594(c). It charged that, from about July 2011 through about October 2016, in Pennsylvania, Florida, California, Georgia, North Carolina and elsewhere, John, Bachtel and other unnamed co-conspirators "conspired and agreed with each other to knowingly recruit, entice, harbor, transport, provide, maintain and obtain, . . . multiple females, including [J.S.], [E.L.[4]], [J.W.], [E.J.] and [G.L.], in and affecting interstate commerce, knowing and in reckless disregard of the fact that means of force, threats of force, fraud, coercion, and any combination of such means, would be used to cause those persons to engage in a commercial sex act." ECF No. 55 at 2-3.[5]

At trial, the jury convicted John as to Count I, finding him guilty of conspiracy to engage in sex trafficking in violation of 18 U.S.C. § 1594(c) upon a theory that an object of the conspiracy was to traffic by force, threats of force, fraud or coercion. ECF No. 135 at 1.

---

[4]    Although Count I of the superseding indictment lists E.L. as a victim of the conspiracy, the Government advised the Court and the jury that E.L. was not to be considered for the conspiracy in Count I.

[5]    The superseding indictment also included language regarding John's knowledge or reckless disregard of the fact that E.J. and J.W. were minors. However, as discussed above, the jury did not convict John on this aspect of the charge.

John now moves for a new trial as to Count I, arguing that there was a lack of evidence "to show John conspired with anyone to use force, threats, fraud, or coercion to sex traffic." ECF No. 170 at 8.

The Court disagrees. First, the Court notes that John's argument is entirely conclusory. Still, ample evidence was introduced at trial to support a finding that John conspired with multiple people to use force, threats, fraud, or coercion to cause J.S., J.W., E.J., and G.L. to engage in commercial sex. For example: John and co-conspirator Bachtel discussed lying to J.S. about a contract in order to convince J.S. to fly to Atlanta for commercial sex, ECF No. 156 at 136; John and co-conspirator "Daisy" took G.L. to buy "some cheap lingerie, a shirt or two, and some cheap heels" to wear and directed G.L. to drink what G.L. believed to be "lean,"[6] which caused her to pass out in a hotel room. ECF No. 159 at 26-31; John and co-conspirator Jay held down E.J. to burn her with a lighter when E.J. did not want to perform commercial sex, ECF No. 133 at 21-22; and John and co-conspirator Jay drove E.J. to a highway and pushed her out of the vehicle, leaving her stranded when she

---

[6]    "Lean" refers to a narcotic substance – codeine cough syrup typically mixed with a soda.

said she wanted to go back home. ECF No. 133 at 22. The Court
will therefore deny the motion.[7]


   2. Count II - Trafficking of J.S.

Count II of the superseding indictment charged John for his
actions surrounding the trafficking of J.S. during the fall of
2016. Count II charged that John and Bachtel "in and affecting
interstate commerce, knowingly recruited, enticed, harbored,
transported, provided, obtained, and maintained [J.S.], . . .
and benefitted financially from participation in a venture which
engaged in the knowing recruitment, enticement, harboring,
transporting, providing, obtaining, and maintaining of [J.S.],
and attempted to do so, and aided and abetted the same" and that
at the time of John's actions "he knew and acted in reckless
disregard of the fact that means of force, threats of force,
fraud, coercion, and any combination of such means would be used

---

[7]    As to evidence-based challenges regarding Count I, John's motions
clearly request only a new trial (not acquittal). See ECF No. 170 at 1,16
("For the reasons argued above, this court should enter an order of judgment
of acquittal as to Count 2, and a new trial as to Count 1, or in the
alternative grant a new trial on Counts 1 and 2."). However, his argument for
a new trial on Count I states simply that "there was insufficient evidence to
show Mr. John conspired with anyone to use force, threats, fraud or coercion
to sex traffic." ECF No. 170 at 8. This "insufficient evidence" language is
more appropriate in a motion for judgment of acquittal. Therefore, the Court
notes that an "insufficient evidence" argument for a judgment of acquittal as
to Count I would also fail upon a consideration of the evidence discussed
above.

to cause [J.S.] to engage in a commercial sex act." ECF No. 55 at 4; see 18 U.S.C. §§ 1591, 1594(a), 2.

John moves for judgment of acquittal as to Count II based on a theory of insufficient evidence. John argues that "[t]he government failed to produce any evidence that could directly prove, or indirectly allow a reasonable inference to be drawn, that the defendant aided or abetted Tyler Bachtel in us[ing] force, threats of force, fraud, or coercion to induce [J.S.] to work [] in a commercial sex enterprise." ECF No. 170 at 5.[8] In other words, John claims there is insufficient evidence upon which the Government could prove John aided and abetted Bachtel in committing the offense against J.S.

To the contrary, there was extensive evidence that supported the verdict on Count II. In early 2016, Bachtel started working for John after the two met up in California and John explained to Bachtel how he ran his commercial-sex operation. ECF No. 156 at 96-98, 103-04. Somerville was also involved; John had her direct customers to hotel rooms Bachtel booked for the females he managed in California. ECF No. 156 at 102-03.

---

[8]     In discussing his motion for acquittal of Count II, John makes one other statement: that "there was no evidence Mr. John and co-defendant Tyler Bachtel had an agreement to use force, threats of force, fraud or coercion to induce [J.S] to work for them in their commercial sex enterprise." ECF No. 170 at 7. However, Count II deals with the substantive sex trafficking of J.S., and it therefore appears that John's statement here mistakenly argues that the jury was required to find a conspiracy between Bachtel and John as to J.S. in Count II.

Initially, John and Bachtel agreed to split the money from any customers John and Somerville sent to have sex with the females Bachtel was managing. ECF No. 157 at 18; ECF No. 156 at 96-99. However, John became upset with Bachtel, accusing him of not moving clients fast enough and of failing to closely oversee some of the females, thereby allowing them to escape with money received from the commercial sex. ECF No. 157 at 19-20.

As a result, according to John, Bachtel owed John money. Bachtel testified that John threatened him regarding this debt, telling Bachtel that he "needed to do what it takes to pay [John] or that he was going to hurt [Bachtel] or have other people hurt [Bachtel]." ECF No. 156 at 131:23-24. John believed that Bachtel could not properly manage the sex workers, and therefore John reassigned Bachtel to simply recruiting sex workers for John to manage. ECF No. 157 at 111-112; ECF No. 156 at 104, 109, 111:8-18 ("[Q:] Did the Defendant . . . explain[] why he wanted you to send the girls to him, at this stage? [A:] Because I was a person that cannot manage... I couldn't hit the girls, put them in their place, and be the person that I needed to be to make him money and make myself money." (fifth alteration in original)). Bachtel was thus in an endless cycle of debt to John, and any work Bachtel did went towards paying off the debt—Bachtel did not receive any payment from John. See ECF No. 157 at 20:20-23 ("[B]ecause [girls] would run away or

10

dates were turned away, I would then owe money to the Defendant and I wasn't able to hold onto [any money] because I was always in debt to the . . . Defendant.").

Later in 2016, Bachtel recruited J.S., lying to her about the type of work she was expected to perform. ECF No. 156 at 129-30; ECF No. 157 at 17-18. Bachtel lied to J.S., telling her that she would be working as a "party girl" and that there would be a legitimate work contract; Bachtel testified that he told John that he had lied to J.S. about these things in order to convince her to fly to Atlanta. ECF No. 156 at 136.

Communicating with John, Bachtel took J.S. to an airport in California to fly to Atlanta. ECF No. 156 at 120-21. In Atlanta, John directed J.S. to perform sex work. ECF No. 155 at 131-37. When J.S. asked about the contract Bachtel had promised her, John stated he "would get to that." ECF No. 155 at 129:13-14; ECF No. 156 at 57:11-12 ("[John] told me that he would be getting [the contract] ready. It was another way of him tricking me."). Before sending the first customer to J.S.'s hotel room in Atlanta, John told J.S. that if "any of these guys tries to do anything you don't want to, and they try to rape you, . . . let them rape [you] because it would be worse if [you] . . . fought back." ECF No. 155 at 132:12-15.

Later, J.S. broke down crying to John, telling him that she could not continue with the sex work. ECF No. 155 at 150-51.

J.S. testified that on that night, after taking J.S. to a bowling alley to drink and eat, John brought her back to a hotel room and raped her as she was trying to sleep. ECF No. 155 at 151. J.S. testified that she continued to engage in commercial sex as directed by John following the rape, as the rape had caused her to become even more fearful of John. ECF No. 155 at 153.

In light of this evidence, a rational jury could find that John aided and abetted Bachtel in trafficking J.S. by means of force, threats of force, fraud, or coercion. Therefore, the Court will deny the motion for judgment of acquittal as to Count II.

In the alternative, John argues that if the Court rejects his argument for judgment of acquittal as to Count II, the Court should "nonetheless set aside the verdict and grant a new trial . . . because it was against the cumulative weight of the evidence." ECF No. 170 at 8. As discussed above, there is substantial evidence to support the verdict as to Count II, so the Court will deny the motion for a new trial as to Count II as well. See Johnson, 302 F.3d at 150 ("A district court can order a new trial on the ground that the jury's verdict is contrary to the weight of the evidence only if it 'believes that "there is a serious danger that a miscarriage of justice has occurred—that

12

is, that an innocent person has been convicted."'" (quoting
Santos, 20 F.3d at 285)).

ount I of the superseding indictment charged John with
engaging in a sex-trafficking conspiracy in violation of 18
U.S.C. § 1594(c). It charged that, from about July 2011 through
about October 2016, in Pennsylvania, Florida, California,
Georgia, North Carolina and elsewhere, John, Bachtel and other
unnamed co-conspirators "conspired and agreed with each other to
knowingly recruit, entice, harbor, transport, provide, maintain
and obtain, . . . multiple females, including [J.S.], [E.L.[9]],
[J.W.], [E.J.] and [G.L.], in and affecting interstate commerce,
knowing and in reckless disregard of the fact that means of
force, threats of force, fraud, coercion, and any combination of
such means, would be used to cause those persons to engage in a
commercial sex act." ECF No. 55 at 2-3.[10]

At trial, the jury convicted John as to Count I, finding him
guilty of conspiracy to engage in sex trafficking in violation
of 18 U.S.C. § 1594(c) upon a theory that an object of the
conspiracy was to traffic by force, threats of force, fraud or
coercion. ECF No. 135 at 1.

---

[9]     Although Count I of the superseding indictment lists E.L. as a victim
of the conspiracy, the Government advised the Court and the jury that E.L.
was not to be considered for the conspiracy in Count I.
[10]    The superseding indictment also included language regarding John's
knowledge or reckless disregard of the fact that E.J. and J.W. were minors.
However, as discussed above, the jury did not convict John on this aspect of
the charge.

John now moves for a new trial as to Count I, arguing that there was a lack of evidence "to show John conspired with anyone to use force, threats, fraud, or coercion to sex traffic." ECF No. 170 at 8.

The Court disagrees. First, the Court notes that John's argument is entirely conclusory. Still, ample evidence was introduced at trial to support a finding that John conspired with multiple people to use force, threats, fraud, or coercion to cause J.S., J.W., E.J., and G.L. to engage in commercial sex. For example: John and co-conspirator Bachtel discussed lying to J.S. about a contract in order to convince J.S. to fly to Atlanta for commercial sex, ECF No. 156 at 136; John and co-conspirator "Daisy" took G.L. to buy "some cheap lingerie, a shirt or two, and some cheap heels" to wear and directed G.L. to drink what G.L. believed to be "lean,"[11] which caused her to pass out in a hotel room. ECF No. 159 at 26-31; John and co-conspirator Jay held down E.J. to burn her with a lighter when E.J. did not want to perform commercial sex, ECF No. 133 at 21-22; and John and co-conspirator Jay drove E.J. to a highway and pushed her out of the vehicle, leaving her stranded when she

---

[11]     "Lean" refers to a narcotic substance – codeine cough syrup typically mixed with a soda.

said she wanted to go back home. ECF No. 133 at 22. The Court

will therefore deny the motion.[12]


   B. Co-Conspirator Testimony

   John moves for a new trial arguing that the Court erred in

admitting, pursuant to the co-conspirator exception to the

hearsay rule, Fed. R. Evid. 801(d)(2)(E), statements of "Daisy"

introduced through the testimony of victim G.L.[13]

---

[12]   As to evidence-based challenges regarding Count I, John's motions
clearly request only a new trial (not acquittal). See ECF No. 170 at 1,16
("For the reasons argued above, this court should enter an order of judgment
of acquittal as to Count 2, and a new trial as to Count 1, or in the
alternative grant a new trial on Counts 1 and 2."). However, his argument for
a new trial on Count I states simply that "there was insufficient evidence to
show Mr. John conspired with anyone to use force, threats, fraud or coercion
to sex traffic." ECF No. 170 at 8. This "insufficient evidence" language is
more appropriate in a motion for judgment of acquittal. Therefore, the Court
notes that an "insufficient evidence" argument for a judgment of acquittal as
to Count I would also fail upon a consideration of the evidence discussed
above.

[13]   At the conclusion of the Government's case, the Court found as follows:

     [T]he Court has admitted co-conspirator statements by Mr.
     John's [sic], Mr. Bachtel, Ms. Somerville, and Ms. Daisy
     subject to a later connection. The Court now finds that on
     the Federal Rule 801(b)[(2)](e), a statement that [is] made
     by a co-conspirator of a party, (inaudible) course and further
     – and so the conspiracy is not hearsay and may be admitted as
     evidence against the co-conspirator, in this case, Mr. John.
         In doing so, the Court considers the totality of the
     circumstances when deciding the admissibility of such
     evidence. The evidence includes not only incriminating
     statements but also casual conversation between co-
     conspirators in order to maintain that cohesiveness and
     convey information relevant to the conspiratorial objectives.
         The Court has examined the circumstances on which these
     statements were made and finds that even though at least two
     of the co-conspirators were not formally charged, they were
     members of the conspiracy. And that, therefore, the
     Government has satisfied its burden of showing that the co-
     conspirator statements were made, that there was a
     conspiracy, that the Defendant was a member of the conspiracy,
     that the statements were made in the course of the conspiracy,

In 2011, G.L., a minor living in Atlanta, posted an ad for escorting on Backpage.com. ECF No. 159 at 16, 18-20, 65-66. When the ad did not generate responses, G.L. looked through other escorting ads on the site in order to reach out to the people who had posted the ads to ask for advice on how to better set up her own ad. ECF No. 159 at 19-20. G.L. called a number associated with one of those ads and spoke with a female named "Daisy." ECF No. 159 at 18-20. Daisy "told [G.L.] that she ran the site and the phones for a girl who worked for a pimp that she worked for[,]" identifying the pimp as John. ECF No. 159 at 20:3-12. Daisy also "told [G.L.] that [John] paid her $200 a week to run the ads and a chat line to get dates for . . . their girls that he had and that she could do the same for [G.L.]." ECF No. 159 at 20:24-25, 21:1.

Daisy and G.L. then arranged to meet at Daisy's home. ECF No. 159 at 21. Daisy showed G.L. around her home workplace. ECF No. 159 at 21. Daisy explained her pimp-assistant work and tactics to avoid police, and the two planned for Daisy to make an ad for G.L. ECF No. 159 at 20-22. At Daisy's instruction, G.L. let Daisy photograph her in a bathing suit and heels. ECF No. 159 at 21.

---

and that the statements were made in furtherance of the conspiracy.
ECF No. 160 at 70:12-25, 71:1-8; see United States v. Turner, 718 F.3d at 231 (citing United States v. Ellis, 156 F.3d 493, 496 (3d Cir. 1996)).

A few days later, Daisy asked G.L. if she would "like to go to lunch with me and a friend of mine." ECF No. 159 at 23:16-17. G.L. agreed to meet her, unaware that the "friend" Daisy mentioned would be the pimp she had been told about. ECF No. 159 at 23. Daisy and John then drove to where G.L. was staying to pick her up. ECF No. 159 at 23-24.

Instead of lunch, Daisy, John, and G.L. parked outside of a CVS, at which point John asked G.L. to do sex work for him. ECF No. 159 at 24-27, 70-72. G.L. initially refused, at which point John became irritated, exited the car, and went into the CVS, leaving Daisy and G.L. in the car alone together. ECF No. 159 at 24-25, 70-72. At this point, Daisy urged G.L. to consider sex work, telling G.L. that John would buy her clothes and lingerie. ECF No. 159 at 25:7-10. When John returned to the car, G.L. told him that she would "consider it." ECF No. 159 at 24-25, 70-72. Upon telling John that she would "consider it," John's attitude changed and he took G.L. and Daisy to a house where he picked up marijuana and about two ounces of codeine cough syrup. ECF No. 159 at 25-26. John then mixed the cough syrup together with some soda to make lean and gave it to G.L. to drink. ECF No. 159 at 26. John pretended to drink the lean as well, but only held the bottle to his lips. ECF No. 159 at 26.

John and Daisy then took G.L. to a shop where John "bought [G.L.] some cheap lingerie, a shirt or two, and some cheap

heels." ECF No. 159 at 26-27. At this point, due to the lean drink John gave her, G.L. "couldn't keep [her] head up" and "couldn't keep from falling to asleep." ECF No. 159 at 27:15-16. G.L. testified that her reaction to the drink was "[n]ot at all" similar to reactions she had previously when drinking lean. ECF No. 159 at 27-28.

G.L. testified that she then "remember[ed] next waking up in a hotel room" but did not remember much of how she arrived there. ECF No. 159 at 29:9-11. At that point, G.L. saw Daisy leaving the hotel room and John instructed G.L. that customers would be arriving to the room soon for commercial sex. ECF No. 159 at 29. G.L. then engaged in commercial sex work at John's direction. ECF No. 159 at 30-31.

When G.L. refused to continue the sex work, John took G.L. to Daisy's home. ECF No. 159 at 42-43. While Daisy and John were together, G.L. told Daisy that she wanted to return to her boyfriend's home but Daisy refused to take her. ECF No. 159 at 44-45. With John present, Daisy initially lied to G.L. about G.L.'s father and boyfriend not wanting her to come home, making G.L. believe that she had nowhere to go. ECF No. 159 at 44-45. At that point, John told G.L. that she was "the weakest bitch [he'd] ever met," and then exited Daisy's house. ECF No. 159 at 44:21-22. With John outside, Daisy told G.L. not to go outside and try to get any of her belongings from John's car because

John was "waiting to put [G.L.] in his trunk." ECF No. 159 at
44:25, 45:1. Daisy then told G.L. she had lied to her about
G.L.'s boyfriend and father because John "wanted [G.L.] to feel
like [she] had nowhere to go so [she] would leave with [John]."
ECF No. 159 at 45:15-17.

John presents two arguments for granting a new trial based on
the admission of Daisy's statements: (1) the statements were not
corroborated by independent evidence and therefore should not be
admissible under Federal Rule of Evidence 801(d)(2)(E); and (2)
admission of the statements violated his rights under the
Confrontation Clause.

In the instant motions, John does not point to any specific
statements of Daisy's that he believes were improperly admitted,
nor does he dispute that any of the statements, if made by a co-
conspirator, were made during and in furtherance of the
conspiracy. Rather, John alleges that in general Daisy's
statements, introduced by way of G.L.'s testimony, were not
independently corroborated and therefore should have been
excluded.

### 1. Federal Rule of Evidence 801(d)(2)(E)

Pursuant to Federal Rule of Evidence 801(d)(2)(E), "a
statement by a 'party's coconspirator during and in furtherance
of the conspiracy' is not hearsay if it is offered against that

party." United States v. Turner, 718 F.3d 226, 231 (3d Cir. 2013) (quoting Fed. R. Evid. 801(d)(2)(E)).  A statement is not hearsay under Rule 801(d)(2)(E), and is thus admissible, if the Government proves the following: "(1) a conspiracy existed; (2) the declarant and the party against whom the statement is offered were members of the conspiracy; (3) the statement was made in the course of the conspiracy; and (4) the statement was made in furtherance of the conspiracy." Id. (citing United States v. Ellis, 156 F.3d 493, 496 (3d Cir. 1998)). And "the Government may rely on the co-conspirator's statements themselves" to show the elements of the exception, but only "if they are corroborated by independent evidence." Id. (quoting Bourjaily v. United States, 483 U.S. 171, 181 (1987)).

John argues only that it was error to admit Daisy's statements under the co-conspirator exception where "no other evidence [other than the statements themselves] existed to corroborate or establish the reliability of the hearsay testimony." ECF No. 186 at 9. According to John, because there was no independent corroboration of the co-conspirator statements, the Government could not meet its burden to establish that a conspiracy existed, that Daisy and John were members of the conspiracy, and that the statements were made in the course of, and in furtherance of, the conspiracy.

John's argument is mistaken. This issue is controlled by the Third Circuit's decision in United States v. Gambino, 926 F.2d 1355 (3d Cir. 1991). In Gambino, a witness, Kane, testified that Tony Mannino told Kane that Mannino and Simone Zito worked for defendant, Francesco Gambino, selling heroin. 926 F.2d at 1358, 1360. To determine the applicability of the co-conspirator hearsay exception, "[t]he district court assumed a need for some external evidence, and found that Gambino was a member of the conspiracy, and that the hearsay statement to Kane was made during the course of and in furtherance of that conspiracy." Id. at 1361. On appeal, Gambino argued that the Government did not adequately establish his connection to the conspiracy. Id. The Third Circuit held that the district court properly relied upon Kane's testimony of Mannino's hearsay statement (that Gambino was Mannino's and Zito's boss) to establish Mannino and Zito's membership in a conspiracy with Gambino. Id. at 1362. Among the "independent evidence" that the Court found properly established the conspiracy was the following:

> [There was a] March, 1988 discussion in the Cafe Giardino
> between Kane and Simone Zito. After some bickering about
> the price of heroin, Simone Zito left for another area
> of the cafe, and upon returning Zito told Kane that the
> price was negotiable, and that he could have a sample of
> the heroin. Shortly thereafter, Kane observed that

> Francesco Gambino and a bartender were the only other
> people in the cafe. It was a permissible inference that
> Zito went to Gambino for authority to negotiate price.

Id. at 1362 (emphasis added).

G.L.'s testimony in this case concerning Daisy's relationship to John is similar. In Gambino, Kane's testimony as to Mannino's statement regarding the existence of a conspiracy between Mannino, Zito, and the defendant was supported by the "independent evidence" that Kane observed Zito and the defendant alone together during a heroin price dispute. Here, G.L.'s testimony as to Daisy's statements regarding the existence of a conspiracy between Daisy and John is supported by the "independent evidence" of G.L.'s personal observations of John and Daisy's conduct. To wit: First, Daisy took photos of G.L. after G.L. told her about her interest in commercial sex. ECF No. 159 at 20-22, 65-68. Second, Daisy and John both picked G.L. up for a trip during which John asked to G.L. to join in sex work. ECF No. 159 at 23-25, 69-72. Third, John gave G.L. lean in Daisy's presence, which made G.L. struggle to stay awake, and, after this, Daisy and John took G.L. shopping for cheap lingerie and heels and took her to a hotel room where G.L. engaged in commercial sex. ECF No. 159 at 26-31. Therefore, the Court properly admitted G.L.'s testimony regarding Daisy's statements

because the statements were independently corroborated, and the Court will deny John's motion.

2. Confrontation Clause

In his Supplemental Motion, John argues that the admission of Daisy's statements violated his rights under the Sixth Amendment's Confrontation Clause.

The Confrontation Clause ensures that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI.

John's Confrontation Clause arguments are based on Ohio v. Roberts, where the Supreme Court held that under the Confrontation Clause, an out-of-court "statement is admissible only if it bears adequate 'indicia of reliability.'" 448 U.S. 56, 66 (1980). And adequate indicia of reliability required that the statement "falls within a firmly rooted hearsay exception" or otherwise was accompanied by "a showing of particularized guarantees of trustworthiness." Id.

But the Supreme Court abrogated Roberts in Crawford v. Washington, where the Court "decline[d] to mine the record in search of indicia of reliability" and held that the admissibility of out-of-court statements under the Confrontation Clause turned on whether the statements were "testimonial" or

"nontestimonial." 541 U.S. 36, 68-69 (2004). The <u>Crawford</u> Court held that the Confrontation Clause precluded "testimonial" out-of-court statements. <u>Id.</u> at 53-56, 68. The Court elaborated that a statement is testimonial if "in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.'" <u>Ohio v. Clark</u>, 576 U.S. 237, 245 (2015) (alteration in original) (quoting <u>Michigan v. Bryant</u>, 562 U.S. 344, 358 (2011)). And the Court in <u>Crawford</u> noted that statements in furtherance of a conspiracy are nontestimonial. 541 U.S. at 56 (noting that "[m]ost of the hearsay exceptions covered statements that by their nature were not testimonial," such as "statements in furtherance of a conspiracy").

John's argument is mistaken. Besides John failing to identify any admitted statements of Daisy which he believes constitute testimonial statements, the Court finds that Daisy's statements, which were admitted, were nontestimonial as statements made in furtherance of a conspiracy. For example, Daisy explained her pimp-assistant work, noted tactics to avoid police, said that she would make an ad for G.L., and told G.L. to consider sex work for John. ECF No. 159 at 20-25, 97-98. Thus, the statements were not barred by the Confrontation Clause and the Court will deny John's motion.

C. <u>Separate Conspiracies Variance</u>

John moves for a new trial, arguing that separate conspiracies were charged together, under Count I, and that therefore the verdict may not be sustained.

In Count I, the Superseding Indictment charged that, in violation of 18 U.S.C. § 1594(c), from approximately July 2011 through October 2016, in the Eastern District of Pennsylvania, Florida, California, Georgia, North Carolina, and elsewhere, John, Bachtel, and others conspired and agreed with each other to knowingly recruit, entice, harbor, transport, provide, maintain, and obtain multiple females, including J.S, J.W., E.J., and G.L., in and affecting interstate and foreign commerce, knowing and in reckless disregard of the fact that means of force, threats of force, fraud, coercion, and any combination of such means, would be used to cause those persons to engage in a commercial sex act.[14] John now argues that the activities surrounding the prostitution of G.L. in 2011, during which John was abetted by Daisy, constitute a separate

---

[14]     Count I of the Superseding Indictment also alleged that "[a]t the time that defendant . . . did this, he knew and acted in reckless disregard of the fact that Minor 4 and Minor 5 had not attained the age of 18 years and would be caused to engage in a commercial sex act and had reasonable opportunity to observe them." ECF No. 55 at 3. In the verdict sheet, the jury indicated it found that allegation not proven, while convicting John of conspiracy to use force, fraud, or coercion to cause persons to engage in commercial sex. <u>See</u> ECF No. 135 at 1.

conspiracy from later events with his associate Somerville beginning in 2012.

"A conviction must be vacated when (1) there is a variance between the indictment and the proof presented at trial and (2) the variance prejudices a substantial right of the defendant." United States v. Kelly, 892 F.2d 255, 258 (3d Cir. 1989); (citing United States v. Schurr, 775 F.2d 549, 553 (3d Cir. 1985)). "There is a variance if the indictment charges a single conspiracy while the evidence presented at trial proves only the existence of multiple conspiracies." United States v. Kemp, 500 F.3d 257, 287 (3d Cir. 2007).

The Third Circuit "employ[s] a three-step inquiry to determine whether a series of events constitutes a single conspiracy or separate and unrelated conspiracies." Kelly, 892 F.2d at 259 (citing United States v. DeVarona, 872 F.2d 114 (5th Cir. 1989)). The Court looks to (1) "whether there was a common goal among the conspirators," (2) whether "the nature of the scheme" was such that "the agreement contemplated bringing to pass a continuous result that [would] not continue without the continuous cooperation of the conspirators," and (3) "the extent to which the participants overlap in the various dealings." Id. (citing DeVarona, 872 F.2d at 118-19).

Here, even assuming the events surrounding G.L.'s commercial sex work constituted a separate conspiracy, John's motion fails

because he cannot show that such a variance prejudiced his substantial rights. See Kemp, 500 F.3d at 291. "The rule against variances serves at least three purposes." Id. First, protection of the right "not to be tried en masse for the conglomeration of distinct and separate offenses committed by others." Id. (quoting Schurr, 775 F.2d at 553). In essence, "the jury should not be permitted to transfer 'guilt from one alleged co-schemer to another.'" Id. (quoting United States v. Perez, 280 F.3d 318, 346 (3d Cir. 2002)). This concern is not implicated in John's case—he oversaw each phase of the conspiracy.

Second, prohibiting variances "ensures that a defendant has adequate notice of the charges being brought against him." Id. (citing Perez, 280 F.3d at 345). This aspect of the rule "protects the defendant's right to an 'indictment sufficiently inform[ing] [him] of the charges against him so that he may prepare his defense and not be misled or surprised at trial.'" Schurr, 775 F.2d at 553-54 (alterations in original) (quoting United States v. Schoenhut, 576 F.2d 1010, 1021–22 (3d Cir. 1978)). This purpose is not implicated by John's case because John was "aware from the indictment as to [his] role in the conspiracy," Kemp, 500 F.3d at 291, even if he argues the events surrounding G.L. are separate from later events. There is no reasonable argument that the Superseding Indictment prevented

John from preparing his defense or otherwise misled or surprised him at trial.

Third, the rule against variances "rests on a principle akin to double jeopardy, for the rule helps to minimize the danger that the defendant may be prosecuted a second time for the same offense." Id. (quoting Schurr, 775 F.2d at 554). This purpose is also not implicated because John argues that the indictment is overbroad—it charges multiple conspiracies as one—and an "overbroad indictment in no way threatens the defendant[] with future prosecutions for the same offense." Schurr, 775 F.2d at 555. Thus, this purpose does not suggest that the alleged variance prejudiced John's substantial rights.

Because John cannot show that he was prejudiced by any alleged variance between the charge of a single conspiracy in Count I and proof of multiple conspiracies, the Court will deny his motion.[15]

---

[15]    The Court further notes that John's argument regarding the separate conspiracies is arguably waived. During trial, counsel for John submitted a letter requesting changes to the proposed jury instructions. See ECF No. 141. The letter concluded as follows:

> [T]o avoid duplicity and evidentiary issues, the defense is requesting a special jury instruction for Count One that distinguishes between the allegations of sex trafficking of the adults and the minors since there are different elements for each of these categories of victims. Any risk of unfair duplicity to the defendant can be cured by a special verdict form that will protect the defendant's right to a unanimous jury.

ECF No. 141 at 1.
     The Court adopted these requests to distinguish between the charged objectives of the conspiracy in both the jury instructions and the verdict

D. <u>Belated Disclosures</u>

John moves for a new trial based on two sets of belatedly-disclosed evidence from the Government.

The first set of evidence, a 42-page report, prepared by James Iverson, a civilian missing-persons investigator for the Hillsborough County Sheriff's Department, was not disclosed to John until shortly before the conclusion of the Government's case-in-chief. John moved for a mistrial based on this belated disclosure. John's current motion for a new trial on this ground simply rehashes the arguments the Court already addressed thoroughly in its August 1, 2019, memorandum upholding its denial of John's motion for a mistrial. <u>United States v. John</u>, 391 F. Supp. 3d 458 (E.D. Pa. 2019). Because the Court finds that it correctly reasoned in the memorandum that any prejudice of the belated disclosure was cured by the Court's seven-part remedy, the Court will deny the motion for a new trial based on this belated disclosure.

The second set of belated disclosures was not addressed in the Court's memorandum, as the disclosure did not occur until June

---

form. <u>See</u> ECF No. 162 at 40-43; ECF No. 135. Therefore, John's current argument that an impermissible variance resulted from the charge of a single conspiracy in Count I and proof of multiple conspiracies, contradicts his earlier argument in the letter that distinguishing between the two objectives of the conspiracy would cure "[a]ny risk of unfair duplicity" and "protect the defendant's right to a unanimous jury." <u>Id.</u>

3, 2019, a few days after John's conviction. John argues that
the post-trial disclosure violated Brady v. Maryland, 373 U.S.
83 (1963), and is grounds for a new trial.

Under Brady, the prosecution must produce to a defendant
evidence that "is material either to guilt or to punishment,"
regardless of the prosecution's good or bad faith. Id. at 87;
see also United States v. Bagley, 473 U.S. 667, 676 (1985)
(noting that Brady applies to both exculpatory and impeachment
evidence); Giglio v. United States, 405 U.S. 150, 154 (1972).
"A Brady violation occurs if: (1) the evidence at issue is
favorable to the accused, because either exculpatory or
impeaching; (2) the prosecution withheld it; and (3) the
defendant was prejudiced because the evidence was 'material.'"
Breakiron v. Horn, 642 F.3d 126, 133 (3d Cir. 2011) (citing
Wilson v. Beard, 589 F.3d 651, 659 (3d Cir. 2009)).

"Evidence is material if there is a reasonable probability
that, if the evidence had been disclosed, the result of the
proceeding would have been different." Wilson, 589 F.3d at 665
(citing Giglio, 405 U.S. at 154). And in evaluating the
materiality of evidence, "[a] 'reasonable probability' of a
different result is shown when the government's evidentiary
suppression 'undermines confidence in the outcome of the
trial.'" Id. (quoting Kyles v. Whitley, 514 U.S. 419, 434
(1995)). The Third Circuit has further explained that "evidence

may be material if it could have been used effectively to impeach or corral witnesses during cross-examination." <u>Johnson v. Folino</u>, 705 F.3d 117, 130 (3d Cir. 2013) (citing <u>United States v. Gil</u>, 297 F.3d 93, 104 (2d Cir. 2002)). That said, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." <u>Wilson</u>, 589 F.3d at 659 (alteration in original) (quoting <u>Kyles</u>, 514 U.S. at 434). Further, "the impact of the suppressed evidence must be considered cumulatively, not individually." <u>Id.</u> (citing <u>Kyles</u>, 514 U.S. at 436).

John's motion discusses two pieces of evidence disclosed post-trial that he believes supports his Motion:

The first piece of evidence discussed by John is a law enforcement report containing "[a] statement by James Wines which claimed that he had visited Jessica Lavigne, a defense witness, while she was in a motel actively working for Mr. John." ECF No. 170 at 14 (the "Lavigne Report"). John says the Lavigne Report "contains no mention of abuse, indicates that Mr. John was not present, and that Jessica Lavigne was uncooperative." <u>Id.</u> According to John, "Lavigne's testimony was inherently biased, as she had a prior romantic relationship with Mr. John." <u>Id.</u> Therefore, John argues that late-disclosed

31

Lavigne Report "would have allowed the Defense to introduce corroborative evidence from a neutral source that would have added credibility to the inference that Mr. John was not abusive to the women working for him, and that the conspiracy involved sex work without coercion." Id.

The second piece of evidence discussed by John is "a report by 'Amanda Rowe' who claims to have spoken with Michael Oliver, an individual who had provided a tip on Mr. John's whereabouts to a public access line." Id. (the "Rowe Report"). John writes that "Michael Oliver reportedly stated that his wife, Carina Seagraves, had been working as a prostitute for Mr. John but that she would call him and would occasionally visit home to see her children." Id.

As to the first element, whether the information withheld is favorable, the Court finds that access to the Lavigne Report and the Rowe Report may have been favorable to John. John essentially believes that this information could support his argument at trial that he was not abusive to the women he trafficked, contrary to findings in the verdict that John's crimes involved force, threats of force, fraud, or coercion. As to the second element, the Government concedes that it inadvertently withheld the information. ECF No. 191 at 38.

However, the Court finds that the information withheld was not material. Defense counsel called Jessica Lavigne at trial and

she testified that she could freely come and go as she pleased, and that John did not subject her to abuse. John argues that there is a benefit to providing evidence from a "neutral source" in that it could add credibility to Lavigne's testimony that she was not abused by John. In light of the substantial evidence regarding multiple other women, evidence that a woman named Carina Seagraves, while working as a prostitute for John, was permitted to call her husband and occasionally visit her children does not undermine the Court's confidence in the outcome of the trial. John's argument, that this late-disclosed evidence undermines the trial testimony by showing that at least some females involved in his operation were not subject to force, threats of force, fraud, or coercion does not undermine the verdict in this case where ample evidence provided showed that, on at least one occasion, one or more of the specific victims identified in the superseding indictment performed a commercial-sex act on account of John's fraud, force, or coercion and as a result of his conspiracy to do the same. See 18 U.S.C. §§ 159, 1594. The extent of the evidence produced at trial in this regard resulted in a verdict worthy of confidence. The motion is therefore denied.

## IV.  CONCLUSION

For the foregoing reasons, the Court will DENY John's post trial motions. An appropriate Order follows.